UNITED STATES DISTRICT
COURT DISTRICT OF
CONNECTICUT

| | | |
|---|---|---|
| VIRGEN CORREA, | : | |
| *Plaintiff*, | : | Civil Case Number |
| | : | |
| v. | : | 3:16-cv-01234 (VLB) |
| | : | |
| COMMISSIONER SOCIAL SECURITY | : | October 5, 2017 |
| ADMINISTRATION | : | |
| *Defendant.* | : | |

## MEMORANDUM OF DECISION

Virgen Correa ("Correa") brings this action under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to challenge the final decision of the Commissioner of Social Security ("Commissioner") denying Correa's application for supplemental security income and social security disability benefits. Correa moves to reverse or remand the Commissioner's decision, arguing the ALJ erred in finding her severe impairments of bipolar disorder and anxiety did not match or medically equal a listing under 20 C.F.R. Part 404, Subpart P, Appendix 1. The Commissioner moves for Judgment on the Pleadings, arguing the ALJ properly evaluated Correa's claim at Step Three. For the following reasons, the Court AFFIRMS the Commissioner's decision.

## Background

### I.  Medical History

The Court has reviewed the evidence and accepts the facts from the parties' joint stipulation of undisputed facts, hereby incorporating them into this opinion. [Dkt. 18-1]. In October 2011, Correa visited Staywell Health Center,

where she received primary care, and she reported feelings of anxiety, depression, and sleep disturbance during both visits. *Id.* ¶ 1. Her primary care physician, Dr. Luis Leon, referred her to St. Mary's Hospital Behavioral Health ("St. Mary's") where she began outpatient mental health treatment on February 23, 2012. *Id.* ¶ 2; *see* Tr. 477. Correa received her outpatient treatment primarily from Elizabeth Korn, APRN, *see generally* [Dkt. 18-1], who diagnosed her with bipolar disorder with most recent episode mixed, severe with psychotic features, anxiety disorder NOS, post-traumatic stress disorder, and cocaine abuse in remission, *id.* ¶ 12. In March, Correa started her treatment on a weekly basis, but thereafter visited St. Mary's on a biweekly basis in April and May, and on a monthly basis during the fall of 2012. *See id.* ¶¶ 5-10, 12-17, 18-19, 21-25. Nurse Korn also diagnosed Correa with cannabis abuse in September 2012. *Id.* ¶ 19. Correa visited St. Mary's monthly from January through July of 2013, but after she only visited St. Mary's once, in October, for the rest of that year. *See id.* ¶¶ 31-40. Correa visited St. Mary's on a monthly basis in 2014. *See id.* ¶¶ 46-52.

Nurse Korn's observations are relatively consistent throughout the duration of Correa's treatment. Correa reported feelings of anxiety and depression, and she periodically reported difficulty with sleep and appetite as well as auditory and visual hallucinations. *See, e.g.,* ¶¶ 6, 13, 19, 32, 37, 41, 47, 49. Nurse Korn nearly uniformly documented Correa's insight, judgment, memory, and concentration as "fair," although in September 2012 Nurse Korn indicated Correa's insight and judgment were "poor." *See, e.g., id.* ¶ 10, 19, 37, 41. Correa was usually described has having normal speech and grooming,

although at times she did not, and she typically appeared alert and oriented. *See, e.g., id.* ¶ 7, 8, 16, 18, 23, 34, 41. *But see id.* ¶ 13. When Correa failed to take her medications, her symptoms worsened. *See, e.g., id.* ¶¶ 13-14. Over the course of her treatment, her Global Assessment of Functioning ("GAF") score varied from as low as 34 in January 2013 to as high as 48 in July 2013, February 2014, and August 2014. *See id.* ¶ 31, 38, 46, 52.

In addition to the treatment Correa received at Staywell and St. Mary's, several examiners evaluated Correa. In January 2013, Dr. Diana Badillo Martinez conducted a consultative examination of Correa on behalf of the Connecticut Disability Determination Services. *Id.* ¶¶ 27-30. Dr. Badillo Martinez observed her "attention span" and "ability to perform mental operations" were "below the norm;" that she "forgets directions, derails, and does not focus well;" and that her insight and introspective abilities were low and her judgment was poor. *Id.* Correa "cannot remember one sentence after delay of 15 even when a cue." *Id.* Notably, Dr. Badillo Martinez opined that her anxiety, easy agitation and disorganization would make it difficult to find and maintain employment. *Id.* ¶ 30. Dr. Mario Perez also completed a form for the State of Connecticut Department of Social Services, opining that Correa could not be expected to work for 12 months or longer and assigning a GAF score of 44. *Id.* ¶ 42. Other consultative examiners assessed Correa's medical records on behalf of the Social Security Administration, and Dr. Gitlow specifically testified at Correa's administrative hearing. *See* Tr. 21.

## II.   ALJ Decision

The ALJ issued its determination on March 27, 2015, the findings of which are subject to review by this Court. Tr. 23. The ALJ determined Correa has not engaged in substantial gainful activity since the alleged onset date: March 9, 2011. Tr. 13. Correa suffers from the following severe impairments: bipolar disorder, anxiety, and cannabis use. *Id.* Her non-severe impairments include hypertension, carpal tunnel syndrome, and peripheral neuropathy. Tr. 14.

The ALJ then determined Correa does not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* The specific listings identified for comparison were § 12.04 (affective disorders), § 12.06 (anxiety related disorders), and § 12.09 (substance addiction disorders). The ALJ did not apply Correa's medical history to each listing in detail, but rather concluded that with respect to paragraph B of sections 12.04 and 12.06, Correa possessed "mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation." *Id.* To satisfy this element of the listing standards, Correa would have had to demonstrate two of the following: "marked restriction" of the first three categories, and repeated episodes of decompensation of extended duration. *Id.* This she did not do.

The ALJ discussed in depth Correa's residual functional capacity ("RFC"). *See* Tr. 15-22. Specifically, the ALJ determined Correa could "perform a full range of work at all exertional levels" but with various nonexertional limitations. *Id.* He addressed Correa's testimony and concluded she was "not entirely

4

credible for the reasons explained in this decision." Tr. 16. To support his reasoning, the ALJ set forth an in-depth chronology of Correa's medical history from October 2011 until August 2014. *See* Tr. 16-20. The ALJ also stated that the treatment history does not support her complaints, particularly because she was not hospitalized and her condition worsened when she was not taking medication. Tr. 20. Importantly, the ALJ noted that Correa could successfully complete many activities of daily living such as living alone in a house, cooking for herself and her dog, washing dishes, completing housework, watching television, taking the bus, getting dressed, collecting cans, cleaning the apartment, ironing, shopping, and handling finances. *Id.*

The ALJ made several determinations regarding the physicians involved in this case. He assigned "little probative weight" to Dr. Badillo Martinez because she only interviewed Correa on one occasion and did not provide a description of discrete functional limitations regarding Correa's mental impairments. Tr. 20. The ALJ similarly did not give Dr. Perez "substantial probative weight," ruling Dr. Perez's conclusions that Correa possessed "marked limitations in remembering locations and work-like procedures" did not match with treating physicians. Tr. 20-21. However, the ALJ afforded "significant probative weight" to the State agency psychological consultant and Dr. Gitlow because the conclusions were consistent with the medical history. Tr. 21.

Lastly, the ALJ concluded that Correa could perform past relevant work as a packer and cleaner, which were classified by the vocational expert as a "light

exertional level, medium as performed and unskilled, and light and unskilled." Tr. 22.

Legal Standard

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (citing 42 U.S.C. § 405(g)). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks and citations omitted). "[A district court] must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Petrie v. Astrue*, 412 F. App'x 401, 403–04 (2d Cir. 2011) (quoting *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)) (internal quotation marks omitted). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." *Ellington v. Astrue*, 641 F.Supp.2d 322, 328 (S.D.N.Y. 2009) (citing *Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir. 1987)).

To be "disabled" under the Social Security Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The SSA has promulgated the following five-step procedure to evaluate disability claims:

1. First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity ("Step One").

2. If she is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits her physical or mental ability to do basic work activities ("Step Two").

3. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations ("Step Three").

4. If the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the Residual Functional Capacity ("RFC") to perform her past work ("Step Four").

5. Finally, if the claimant is unable to perform her past work, the [Commissioner] then determines whether there is other work which the claimant could perform ("Step Five").

*Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (citing 20 C.F.R. § 404.1520). Correa challenges only Step Three.

Discussion

## I. Step Three

Correa argues the ALJ erred at Step Three with respect to her schizophrenic, paranoid or psychotic disorder (Listing 12.03), affective disorder (Listing 12.04) and anxiety disorder (Listing 12.06). [Dkt. 18-2 (Mem. Mot. Reverse) at 33]. In particular, Correa contends the ALJ erred in relying on the medical expert

testimony of Dr. Gitlow whose conclusions do not match the substantial evidence. *See id.* She also posits the ALJ failed to give appropriate deference to the GAF scores reported by treating physicians. Defendant disputes these contentions.

A. *Listings 12.04 and 12.06*

The Court first addresses Listings 12.04 and 12.06 because the ALJ considered them in his determination. The ALJ did not explicitly address the requirements set forth under Listings 12.04 and 12.06, but instead generally concluded that Correa's bipolar and anxiety disorders did not meet the requirements. *See* Tr. 14-15. An ALJ who makes an adverse finding at Step Three must "set forth a specific rationale" to support his conclusion. *Berry v. Schweiker*, 675 F.2d 464, 468 (2d Cir. 1982) (per curiam). However, this does not mean the ALJ must go through an in-depth analysis of the listing requirements because "the absence of an express rationale does not prevent [the court] from upholding the ALJ's determination" of listed impairments so long as "the ALJ's decision and the evidence before him indicate that his conclusion was supported by substantial evidence." *Id.*; *Solis v. Berryhill*, ---F. App'x---, 2017 WL 2416900, at *2 (2d Cir. June 5, 2017) (citing *Schweiker* for the same proposition). Where a court "would be unable to fathom the ALJ's rationale in relation to the evidence in the record, especially where credibility determinations and inference drawing is

required," the court should "not hesitate to remand the case for further findings or a clearer explanation for the decision." *Berry*, 675 F.2d at 469.

Step Three requires the ALJ to compare the claimant's severe impairments with a listed impairment under 20 C.F.R. Part 404, Subpt. P, App. 1. Where mental impairments are at issue, the ALJ must utilize the "psychiatric review technique" established under 20 C.F.R. § 404.1520a. *See Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008); *Lewis v. Colvin*, 122 F. Supp. 3d 1, 6 (N.D.N.Y. 2015). This technique requires an extra analysis at Steps Two and Three: "the reviewing authority must 'rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c), of this section and record [the] findings in accordance with paragraph (e) of this section.'" *Kohler*, 546 F.3d at 265-66 (citing 20 C.F.R. § 404.1520(b)(2)). Paragraph (c) identifies "four broad functional areas" to rate the degree of functional limitation: (1) "[u]nderstand, remember, or apply information"; (2) "interact with others"; (3) "concentrate, persist, or maintain pace"; and (4) "adapt or manage oneself." 20 C.F.R. § 404.1520(c)(3). When rating such factors, the ALJ is to use the five classifications of "none," "mild," "moderate," "marked," and "extreme." 20 C.F.R. § 404.1520(c)(4). After making these determinations, the ALJ must then evaluate whether the limitations are "severe"; a finding of "severe" requires the ALJ to "compare the relevant medical findings and the functional limitation ratings to the criteria of listed mental disorders in order to determine whether the impairment meets or is equivalent in severity to any listed mental disorder." *Kohler*, 546 F.3d at 266 (citing 20 C.F.R. § 404.1520a(d)(2)). The ALJ is required to document these

steps under § 404.1520a(e) and satisfies this requirement when the written decision "reflect[s] application of the technique" and includes "a specific finding as to the degree of limitation in each of the functional areas." *Id.*

"For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). The plaintiff bears the burden of establishing she meets the requirements of a listed impairment. *Id.* Here, the ALJ compared Correa's bipolar disorder to Listing 12.04, anxiety to Listing 12.06, and cannabis abuse to 12.09. Both Listings 12.04 and 12.06 contain requirements outlined under paragraphs A, B, and C, and the claimant must satisfy either paragraphs A and B or paragraphs A and C. The ALJ did not make a finding as to paragraph A but ruled paragraphs B and C were not satisfied. Correa only challenges Part B. *See Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) ("The severity regulation requires the claimant to show that he has an 'impairment or combination of impairments which significantly limits' 'the abilities and aptitudes necessary to do most jobs.'"). The Court therefore needs only address the sufficiency of Part B.

Part B contains the same content for Listings 12.04 and 12.06. With respect to Part B for both listings, a claimant must show at least **two** of the following: (1) "[m]arked restriction of activities of daily living"; or (2) "[m]arked difficulties in maintaining social functioning"; or (3) [m]arked difficulties in maintaining concentration, persistence, or pace; or (4) "[r]epeated episodes of decompensation, each of extended duration." *Id.* The ALJ determined Correa

demonstrated "mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation." Tr. 14. Although the ALJ made these determinations within the context of the application to the listings, the Court finds that he has nonetheless provided specific findings regarding the degrees of functional limitations as required by § 404.1520a(e).

### 1. *Activities of Daily Living*

With respect to Correa's restrictions of daily living activities, under § 12.00 of 20 C.F.R. Part 404, Subpt. P, App. 1,[1] "activities of daily living" include "adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." Such activities are measured by the "independence, appropriateness, effectiveness, and sustainability" with which the claimant can perform them. *Id.*

---

[1] An agency does not have the authority to create retroactive rules unless it has express authority by Congress to do so. *See id.* Under the Social Security Act, Congress gave the Commissioner of the SSA the "full power and authority to make rules and regulations and to establish procedures . . . which are necessary to carry out such provisions, and shall adopt reasonable and proper rules and regulations to regulate and provide for the nature and extent of the proofs and evidence and the method of taking and furnishing the same in order to establish the right to benefits hereunder." 42 U.S.C. § 405(a). This provision does not grant the SSA express statutory authority to retroactively promulgate rules. *See Nutkins v. Shalala*, No. 92-CV-40, 1994 WL 714252, at *3 (W.D.N.Y. Dec. 22, 1994); *Cherry v. Barnhart*, 327 F. Supp. 2d 1347, 1357 (N.D. Okla. 2004). Therefore, the Court will evaluate the ALJ's determination under Step Three pursuant to the listings that were in effect at that time.

"Marked" is defined by the "nature and overall degree of interference with function," and by way of example "if you do a wide range of activities of daily living, we may still find that you have a marked limitation in your daily activities if you have serious difficulty performing them without direct supervision, or in a suitable manner, or on a consistent, useful, routine basis, or without undue interruptions or distractions."  *Id.*

The Court finds that substantial evidence supports the ALJ's finding that Correa has "mild" restrictions of daily living activities.  Correa by her own admission lives alone, and by herself she is able to take care of her pet dog, watch television, cook, do her dishes, and take the bus (although she reports needing assistance from the bus driver).  Tr. 77, 79, 88, 90, 91.  Correa denies being able to do her own laundry or food shopping, Tr. 90, but evidence in the record indicates she has been able to complete these tasks.  *See* Tr. 369-71 (wherein claimant stated in an Activities of Daily Living Form dated May 25, 2012, that she shops, cleans, does the laundry, and irons).  She is also able to pay bills. Tr. 399.  There is substantial evidence in the record indicating Correa was able to adequately groom and dress herself.  *See, e.g.,* Tr. 541, 549, 847.  Correa's solitary life necessarily means she completes most, if not all, of these activities by herself.  Therefore, the ALJ did not err when he determining her to have "mild" difficulties with activities of daily living.  *See Lewis*, 122 F. Supp. 3d at 6 (affirming ALJ's finding of "mild difficulties" with daily activities where the claimant was "able to cook, do laundry, shop, shower herself, dress herself, and bathe daily").

### 2.       *Social Functioning*

Correa also challenges the ALJ's determination that she possessed "moderate" difficulties in maintaining social function. "Social functioning" as set forth in § 12.00 of 20 C.F.R. Part 404, Subpt. P, App. 1, is the "capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals." This includes "the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers." *Id.* A person who has impaired social functioning may have "a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation." *Id.* The ALJ is to "consider cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity." *Id.* Like the measurement of daily activities, social functioning is defined "by the nature and overall degree of interference with functioning." *Id.* An individual who is "highly antagonistic, uncooperative, or hostile, but are tolerated by local storekeepers" may nonetheless have a "marked" difficulty "because that behavior is not acceptable in other social contexts." *Id.*

The record makes clear that Correa lives alone and generally isolates herself from others. *See, e.g.,* Tr. 493, 548. When evaluated by Dr. Badillo Martinez, Correa was documented to have "difficulty talking to the examiner because she is afraid of people." Tr. 549. Her brother, mother, and aunt passed away and she lost custody over her six children. Tr. 548-49, 820, 840. On occasion her daughter, the only child with whom she has contact, will visit and help with household chores. Tr. 79. Correa also takes the bus periodically and will interact with the bus driver in order to receive assistance to arrive at her final

destination. Tr. 91. The evidence indicates she goes to church on a regular basis, although she does not claim to interact with people. Tr. 373.

While mental health practitioners are not listed in § 12.00, interactions with them may be considered. *See Lovell v. Colvin*, 137 F. Supp. 3d 347, 352 (W.D.N.Y. 2015) ("As the ALJ noted, the longitudinal medical evidence in the record shows that plaintiff interacted appropriately with medical personnel during examinations."). Evidence in the record indicates that Correa is typically "cooperative" when interacting with physicians. Tr. 541, 549, 835-36. Such observations conflict, in part, with Dr. Badillo Martinez's note that "[s]he does not tolerate being around people, is easily overwhelmed, and impulse control is poor." Tr. 550. However, this notation appears to be a report from the patient herself, rather than from Dr. Badillo Martinez's own observations, diagnostic testing or diagnosis. Indeed, consultative examiners who reviewed the record determined Correa experienced only "mild" or "moderate" difficulties in social functioning. *See* Tr. 116 (Dr. Nathaniel Kaplan, 4/02/2012), 124 (Dr. Virgnia Rittner, 5/25/12), 135 (Dr. Cory Sells, 1/11/13), 162 (Dr. Kenneth Bangs, 4/4/13). The ALJ's determination, which comports with other examiners who reviewed the entirety of the record, is reasonable particularly in light of the fact the treating physicians administered medical observations but did not opine on Correa's degree of functioning. That one physician reported Correa cannot tolerate other people well is not sufficient to warrant remand in light of the objective evidence from treating physicians. Accordingly, the Court finds substantial evidence supports the ALJ's findings on this issue.

### 3. *Concentration, Persistence, or Pace*

Correa does not challenge the ALJ's ruling that she possessed "mild" restrictions regarding concentration, persistence, or pace and accordingly the Court will not address this issue.

### 4. *Decompensation*

Correa contends that her treating physicians consistently gave her a GAF score below 50, which "demonstrate[s] virtually continuous decompensation." [Dkt. 18-2 at 43]. While Correa acknowledges a GAF score alone is not dispositive, she contends a score below 50 "suggest[s] an inability to keep a job" and is instructive for paragraph B of the listing analysis. *Id.* at 44. Defendant does not disagree, but argues the ALJ appropriately considered the GAF scores, which conflict with other evidence indicating moderate limitations. [Dkt. 23-1 at 18]. Defendant also acknowledged the ALJ's reliance on Dr. Gitlow's testimony that GAF scores below 50 reflect either severe symptoms or severe impairment, and that her scores in consideration of the other evidence indicate she possessed severe limitations but not severe impairments. *Id.* at 18-19. One must assess both the nature, duration and persistence of severe symptoms to determine whether they constitute severe impairments.

"*Episodes of decompensation* are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.00(C)(4). Such episodes can be "demonstrated by an

exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two)." *Id.* Evidence in medical records may demonstrate episodes of decompensation where they "show[ ] significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode." *Id.* "Repeated episodes of decompensation, each of extended duration" specifically "means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." *Id.* The ALJ is to use his judgment when a claimant experiences "more frequent episodes of shorter duration or less frequent episodes of longer duration" in determining whether the duration and functional effects are equivalent. *Id.*

The GAF scores found within this record are unaccompanied by an explanation, and they alone do not demonstrate Correa experienced decompensation episodes as required in paragraph B. *See Merancy v. Astrue*, 3:10cv1982(MRK)(WIG), 2012 WL 3727262, at *10 (D. Conn. May 3, 2012) ("As one court observed, '[n]otably, the mental disorder Listings [including Listing 12.04] do not reference GAF scores. Thus, an individual's GAF does not determine whether the requisite level of severity has been met for the purposes of Social Security disability.'") (quoting *Scheu v. Astrue*, No. 2:08-00081, 2010 WL 711813, at *5 (M.D. Tenn. Feb. 23, 2010)); *Seymore v. Apfel*, 131 F.3d 152 (Table), 1997 WL 755386, at *2 (10th Cir. 1997) ("Contrary to claimant's contention, a GAF rating of

45 may indicate problems that do not necessarily relate to the ability to hold a job; thus, standing alone without further narrative explanation, the rating of 45 does not evidence an impairment seriously interfering with claimant's ability to work.").  An ALJ may consider GAF scores during the periods of decompensation and nonetheless determine a claimant did not experience repeated episodes of decompensation."  *See Horst v. Comm'r of Soc. Sec.*, 551 F. App'x 41, 47 (3d Cir. 2014) ("There is no indication that the ALJ rejected Appellant's mental health providers' assessments during episodes of decompensation. The ALJ specifically discussed all of the episodes Appellant highlights, and noted in her opinion that she had considered the clinicians' subjective GAF scores.").

In addition, the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision ("DSM-IV-TR") identifies the GAF Scale as a method for clinicians to report an individual's overall level of functioning.  *DSM-IV-TR*, 32 (4th ed. 2000).  Notably, the GAF Scale was eliminated from the DSM-V "for several reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice."  *DSM-V*, 16 (5th ed. 2013).  The GAF Scale "does not have a direct correlation to the severity requirements in [the SSA's] mental disorders listings."  Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000); *Myers v. Colvin*, 721 F.3d 521, 526 (8th Cir. 2013).   Claimant had not demonstrated that the ALJ failed to adequately consider the GAF Scores.

The GAF Scale is designed for rating "psychological, social, and occupational functioning" at the current period and "will generally reflect the need for treatment of care." *DSM-IV-TR*, at 32. The Scale is from 1-100 with a low score indicating more severe limitations. *Id.* A score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." *Id.* at 32. A score of 31 to 40 demonstrates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." *Id.*

With the exception of one score of 34 from January 2013, Tr. 829, treating physicians uniformly gave Correa a GAF score between 41 and 50. *See, e.g.,* Tr. 824, 842, 822. There is evidence in the record that Correa experienced suicidal ideation; Tr. 819-20 (2/23/12), 585 (12/31/12); and does not engage with others; Tr. 829 (documenting Correa as "anxious and fearful of social situations" as of 1/14/13), 85 (wherein Correa testified she gets "so nervous" and "cannot be around other people"). The evidence also indicates Correa lost her job in October 2012, which she appears to have begun in September. *See* Tr. 553, 535. There is no explanation provided about the manner in which she lost her job, and indeed it could have been for reasons unrelated to her performance.

Dr. Gitlow testified that Correa's consistent score between 41 and 50 indicates she had severe symptoms but not severe impairments. Tr. 40-41. This interpretation comports with the plain language of the definition. *See Lee v. Barnhart*, 117 F. App'x 674, 678 (10th Cir. 2004) (explaining that a GAF score between 41 and 50, standing alone, is not evidence of "an impairment seriously interfering with a claimant's ability to work" because it "might lie solely within the social, rather than the occupational, sphere," but acknowledging a score below 50 "does suggest an inability to keep a job"). Therefore, the ALJ did not err when he determined Correa's GAF scores did not necessarily indicate a severe impairment.[2] The ALJ also opined in a separate section that "[a] GAF score is not a precise functional assessment that describes specific mental work-related limitations." Tr. 17 n.1. In light of the DSM-V's removal of the GAF Scale, which the ALJ considered, *id.*, it is appropriate for the ALJ to base its decision on other evidence. Such consideration is consistent with the Claimant's acknowledgment that the GAF Scores alone are not a basis for a disability determination.

In consideration of his testimony; the ALJ's discussion of the GAF scores and the reliability of the test, Tr. 17; the substantial evidence in the record

---

[2] Correa raises credibility issues with respect to Dr. Gitlow's testimony. However, the analysis at step three requires a review of *objective* medical evidence. 20 C.F.R. § 416.925(c)(3) ("Within each listing, we specify the objective medical and other findings needed to satisfy the criteria of that listing."); *Bates v. Barnhart*, 222 F. Supp. 2d 1252, 1258 (D. Kansas 2002) ("Although the ALJ may make credibility assessments at steps four and five, determinations at step three must be made purely on the medical evidence."); *Holt v. Beryhill*, ---F. Supp. 3d---, 2017 WL 1244021, at *7 (W.D. Wash. Apr. 5, 2017) ("The ALJ's analysis at step three must rely only on medical evidence and not rely on age, education or work experience."). Indeed, the ALJ's evaluation of the clinicians' and the claimant's credibility is discussed within his step four analysis. *See* Tr. 20-22.

indicating Correa did not have severe impairments; and the fact that the DSM-V affirmatively indicated its "questionable psychometrics in routine practice;" the Court finds remand is not warranted on these grounds.

B. *Listing 12.03*

In addition, Correa alleges that she "presented evidence of meeting or equaling the criteria" for Listing 12.03. The ALJ did not identify Correa as having a severe impairment meeting or medically equaling the severity of schizophrenic, paranoid and other psychotic disorders (Listing 12.03).[3] It appears, therefore, the ALJ did not consider this Listing in his analysis.

"For a claimant to show that [her] impairment matches a listing, it must meet *all* of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). Although § 12.03 requires a claimant to satisfy either paragraphs A and B or paragraphs A and C, Correa only provided a legal analysis for paragraph B, which is identical to the paragraph B set forth under §§ 12.04 and 12.06. Given the Court affirms the ALJ's determination with respect to his findings for paragraph B under §§ 12.04 and 12.06, the Court finds that Correa has not met her burden for § 12.03.

## Conclusion

---

[3] To the extent Correa claims the ALJ's failure to determine her schizoaffective and paranoid symptoms constituted "severe impairments" were reversible error at Step Two, the Court notes that the ALJ considered her hallucinations and paranoia at later stages in his analysis. Where an ALJ proceeds past step two and considers the effects of all of a claimant's impairments through the remainder of the sequential evaluation process, any error at step two is harmless. *Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013); *Stanton v. Astrue*, 370 F. App'x 231, 233 n.1 (2d Cir. 2010) (errors at step two are harmless as long as the ALJ continues with the sequential analysis).

For the aforementioned reasons, the Court hereby AFFIRMS the Commissioner's decision.  The Clerk is directed to close this case.

IT IS SO ORDERED.

_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut.